# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MIKAIL WILLIAMS,<br><br>Defendant. | Criminal Action No. 23-440 (CKK) |

## MEMORANDUM OPINION
(October 31, 2024)

The Government has charged Mikail Williams with one count of unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  Indictment, ECF No. 8.  Now pending before the Court are Williams's [15] Motion to Suppress Tangible Evidence ("Def.'s Mot. I"), in which he argues that the search and seizure of his person and vehicle on November 30, 2023, were unlawful and that the fruits of those searches and seizures should be suppressed at trial; and his [58] Motion to Suppress Statements ("Def.'s Mot. II"), in which he argues that certain statements he made on November 30 are inadmissible because they were obtained during custodial interrogations conducted without a *Miranda* warning.  The Government opposes both motions. Gov't Opp'n to Def.'s Mot. to Suppress [Tangible Evidence] ("Gov't's Opp'n I"), ECF No. 22; Gov't Opp'n to Def.'s Mot. to Suppress Statements ("Gov't's' Opp'n II"), ECF No. 79.  Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the

---

[1] The Court's consideration has focused on Williams's Motion to Suppress Tangible Evidence ("Def.'s Mot. I"), ECF No. 15; the Government's Opposition to Defendant's Motion to Suppress ("Gov't's Opp'n I"), ECF No. 22; William's Reply in Support of Motion to Suppress ("Def.'s Reply"), ECF No. 25; Williams's Supplemental Brief in Support of Defendant's Motion to Suppress Tangible ("Def.'s First Supp. Br."), ECF No. 44; the Government's Response to Defense Supplement in Support of the Defendant's Motion to Suppress ("Gov't's First Supp. Br."), ECF No. 51; Williams's Supplemental Reply in Support of Defendant's Motion to Suppress Tangible Evidence ("Def.'s Supp. Reply"), ECF No. 63; the Government's Response to the Court's October 4, 2024 Order ("Gov't's Second Supp. Br."), ECF No. 68; Williams's Response to Court's Order for Further Briefing on Defendant's Motion to Suppress Tangible Evidence ("Def.'s Second Supp. Br."), ECF No. 70; Williams's Motion to Suppress Statements ("Def.'s

Court shall **GRANT** the [15] Motion to Suppress Tangible Evidence and **GRANT IN PART** and **DENY IN PART** the [58] Motion to Suppress Statements.

## I.    FINDINGS OF FACT

The Court held an evidentiary hearing on the Motion to Suppress Tangible Evidence beginning on September 17, 2024, and continuing on September 30, 2024.  At the Government's request, following supplemental briefing, the Court then reconvened the evidentiary hearing on October 24, 2024, to hear additional testimony.  The Court has considered the evidence presented at all three days of the hearing, including the parties' exhibits and the testimony of the parties' witnesses.  In doing so, the Court has considered the demeanor and behavior of the witnesses on the stand, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case.  The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witnesses in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence.  The Court credits the following testimony of witnesses Thomas Schemmel, John Holder, Anthony Gaton, and Carter Moore, all of whom are current or recently retired officers of the Metropolitan Police Department (MPD).

The Court has also considered the parties' submissions and the entire record in this case, including the significant volume of body-camera video and audio introduced into evidence that

---

Mot. II"), ECF No. 58; and the Government's Opposition to Defendant's Motion to Suppress Statements ("Gov't's Opp'n II"), ECF No. 79.

captures the relevant events of November 30 from multiple perspectives. The body-camera videos include timestamps that allow the Court to place the relevant events in precise sequence.[2]

The Court makes the following findings of fact, beginning with findings that are relevant to the pending motions and undisputed or uncontroverted by any evidence and concluding with findings regarding facts that are disputed.

### A.    Undisputed or Uncontroverted Facts

This case arises from an investigation that took place primarily on the evening of November 30, 2023, during which MPD officers arrested Defendant Mikail Williams and recovered a handgun and ammunition from the glovebox of a car that they unlocked using keys that Williams had been carrying.

#### 1.    Instagram Video

While on duty on November 29, 2023, Officer Thomas Schemmel viewed a live video streamed on Instagram Live in which two individuals brandished handguns while singing and dancing to music. Evidentiary Hr'g Tr. (Sept. 17, 2024) ("Sept. 17 Tr."), ECF No. 62, at 13–14; Gov't Ex. A. Officer Schemmel recognized one of these individuals as Mikail Williams, whom he knew often used the Instagram account through which the video had been published. Sept. 17 Tr. at 15. Officer Schemmel knew from prior experience with Williams that he was not lawfully permitted to possess a firearm. *Id.* at 20. Officer Schemmel told other officers about the video and asked them to inform him if they saw Williams while on patrol. *Id.* at 21.

#### 2.    Initial Contact

While on patrol the next day, Officer Schemmel and his partner, Officer Carter Moore, encountered Williams, first approaching him at approximately 6:42 p.m. as he was walking west

---

[2] The Court's citations to body-camera video exhibits in this Memorandum Opinion refer to these timestamps, which appear in the upper right corner of the frame in each video.

on the south side of H Street SE.  Gov't's Ex. B-1 at 18:42:20–18:42:27.  It was dark outside at the time the officers approached Williams.  *See id.*  Williams walked past the officers, without stopping, while singing and holding his cell phone up near eye level with its flashlight illuminated. *Id.*  Officer Schemmel, who was familiar with Williams from past interactions, considered this behavior unusual because Williams would ordinarily engage Officer Schemmel in conversation when encountering him on patrol.  Sept. 17 Tr. at 23–24.  At the time that Officer Schemmel encountered Williams, at least one other unidentified person nearby was also holding his phone up and shining its flashlight in a similar manner.  *Id.* at 18:42:20–18:42:25, 18:42:31–18:42:32.

Officer Schemmel then radioed to other officers, telling them that their "target" was in the area and that they should come to his location if they were available.  *Id.* at 18:42:38–18:42:43. After giving a description of Williams's location and what he was wearing, Officer Schemmel instructed, "Make contact with him."  *Id.* at 18:42:52–18:43:00.  Officer Schemmel then began to follow several dozen feet behind Williams.  *Id.* at 18:43:00–18:43:20.  He said over the radio to other officers that Williams was "acting abnormal by recording [the officers], normally he doesn't do that."  *Id.* at 18:43:06–08.  Officer Schemmel then said, "Yeah, we have enough to stop him and pat him down."  *Id.* at 18:43:20–18:43:23.

Seconds later, Officer Anthony Gaton approached Williams.  Gov't's Ex. C-1 at 18:43:22–18:43:25.  Officer Gaton told Williams, "Come here, sir," and reached out to grab him.  *Id.* at 18:43:24–18:43:30.  As Officer Gaton reached out, Williams fled, running away from the officer and into traffic on Benning Road SE.  *Id.*

Immediately after Williams crossed the center line dividing traffic on Benning Road SE, he was struck by an oncoming car.  *Id.* at 18:43:29–18:43:31.  Officers then hurried to Williams. *Id.*  As the officers approached, Williams pulled up his shirt to reveal his waistband and repeatedly

told the officers, "I don't have nothing." Gov't's Ex. C-3 at 18:43:34–18:43:37. The officers then surrounded him and performed a protective pat-down. *Id.* at 18:43:37–18:44:07. Because Williams was resisting their efforts to pat him down, the officers placed him in handcuffs. *Id.* They then led Williams to the curb, where they sat him down. *Id.* at 18:44:08–18:44:28. At the same time, other officers called for medical assistance and began taking down the information of the driver of the car that struck Williams. *Id.* at 18:43:37–18:44:28; Def.'s Ex. 8 at 18:43:50–18:44:32.

While the officers were taking Williams to the curb and gathering information about the collision, a crowd began to gather. *Id.* at 18:44:00–18:45:15. Some people in the crowd called out to the officers, urging them to take the handcuffs off Williams and call an ambulance. *Id.* at 18:45:27–18:45:45.

About two minutes after the initial stop, Officer Gaton removed the handcuffs from Williams. *Id.* at 18:45:45–18:45:50. As he was removing the handcuffs, Officer Gaton instructed Williams, "Hey, we'll just need the ambulance to check you out, though. You can't go, alright?" *Id.* at 18:45:52–18:45:56. Officer Gaton also told Williams, "You've got to stay sitting down here." *Id.* at 18:45:59–18:46:04.

Gaton asked Williams if he was carrying identification. *Id.* at 18:46:08–10. When Williams responded that he was not, the officer told him he would need to give his information to another officer so that the officers could complete an accident report. *Id.* at 18:46:10–18:46:17. Officer Gaton then told Williams that he realized he was in pain, but that he needed to remain sitting upright. *Id.* at 18:46:30–18:46:45. Officer Gaton also asked Williams what was hurting him, but Williams did not answer. *Id.* at 18:46:45–18:46:50.

At approximately 6:51 p.m., about seven minutes after the initial collision, a firetruck arrived, and emergency medical technicians (EMTs) began to assess Williams's condition. *See* Def.'s Ex. 7 at 18:51:06–18:52:08, 18:52:36–18:52:46. The EMTs eventually asked Williams whether he wanted to go to the hospital, and he answered, "Yes." Gov't Ex. F-3 at 18:53:33–18:53:44. The EMTs then called for an ambulance to transport Williams. *See id.*

### 3. Warrant Query and Seizure of Keys

About 15 minutes after the firetruck and EMTs arrived, Officer Schemmel went to a patrol car to run Williams's name through the Washington Area Law Enforcement System (WALES), a database used to check for outstanding warrants and other information. Gov't Ex. B-2 at 19:08:50–19:11:30.

As Officer Schemmel searched for outstanding warrants in the patrol car and the EMTs waited for an ambulance to arrive to take Williams to the hospital, Williams passed a set of car keys to his mother, who had arrived at the scene a few minutes earlier. Gov't Ex. F-1 at 19:11:30–19:11:45; *see also* Def.'s Ex. 7 at 19:03:15–19:03:18 (showing mother's arrival).

Seconds after Williams passed the keys to his mother, Officer Schemmel received a "hit" from the WALES database indicating that there was an active warrant out for Williams's arrest. Gov't Ex. B-2 at 19:11:30–19:12:00; Def.'s Ex. 7 at 19:11:30–19:12:00. Sergeant Hiller, who was sitting in the car with Officer Schemmel, directed Officer Schemmel to "confirm that through dispatch" and said, "That's probably why he ran." Def.'s Ex. 7 at 19:11:51–19:12:01; Evidentiary Hr'g Tr. (Sept. 30, 2024) ("Sept. 30 Tr."), ECF No. 69, at 20 (identifying Sergeant Hiller). Schemmel then said to another officer over the radio, "We need the keys, if that's the case." Gov't Ex. B-2 at 19:12:12–19:12:19; Def.'s Ex. 7 at 19:12:12–19:12:19. That officer responded that Williams had handed the keys to his mother. Gov't Ex. B-2 at 19:12:20–19:12:25; Def.'s Ex. 7 at 19:12:20–19:12:25. Officer Schemmel then asked the officer to "keep eyes on" the keys.

6

*Id.* at 19:12:28–19:12:29.  Another officer approached the patrol car and asked Officer Schemmel through the passenger-side window, "Do you want those keys?"  Gov't's Ex. B-2 at 19:12:38–19:12:39; Def.'s Ex. 7 at 19:12:38–19:12:39.  Officer Schemmel responded, "Just chill out for a second.  Just watch them.  Just watch them for right now."  *Id.* at 19:12:39–19:12:46.

Consistent with MPD protocol and Sergeant Hiller's instructions, Officer Schemmel then radioed dispatch to confirm whether the warrant he found through WALES was still valid and active.  Gov't's Ex. B-2 at 19:13:00–19:13:26; Def.'s Ex. 7 at 19:11:51–19:12:01 (Hiller's instructions); Sept. 30 Tr. at 20–21 (describing protocol).  He then alerted other officers on the scene that he had done so and directed them to "stand by."  Gov't's Ex. B-2 at 19:13:45–19:13:46.  Dispatch initially responded that there was no valid warrant matching the information Officer Schemmel had provided for Williams.  *Id.* at 19:13:46–19:13:58.  Officer Schemmel told dispatch that his check of WALES had returned a matching warrant, and he asked dispatch to check again.  *See* Gov't's Ex. B-2 at 19:14:18.

While Officer Schemmel was waiting for confirmation from dispatch and Williams was being taken on a stretcher to an ambulance, Williams directed his mother to pass the keys to one of his friends, saying, "Give them to him," and pointing to the friend to identify him.  Gov't's Ex. G at 19:14:50-10:14:54.  Williams's mother then walked away from Williams and gave the keys to his friend, who placed them in a zippered pocket of his jacket.  *See id.* at 19:14:56–19:15:20.  The friend remained at least a dozen feet from Williams—well outside of arm's reach—throughout this encounter and the interactions that followed.  *Id.* at 19:14:53–19:15:07.

Officer Schemmel, still sitting in the patrol car and waiting for a response from dispatch, asked where the keys were.  Gov't's Ex. B-2 at 19:14:55–19:14:59.  Another officer responded that Williams had given the keys to his mother, who had given them to a third person.  *Id.* at

7

19:14:59–19:15:06.  Officer Schemmel then said to Sergeant Hiller, "Sarge, if you're good with it, let's just take the keys for right now."  *Id.* at 19:15:08–19:15:12; *see* Sept. 30 Tr. at 24 (identifying Sergeant Hiller).

As Williams's friend was placing the keys in his zippered pocket, an unidentified officer said, apparently to Officer French, "Take the keys."[3]  Gov't's Ex. G at 19:15:15–19:15:16.  Officer French walked over to the patrol car where Officer Schemmel was searching for a warrant and asked the officers gathered there, "Talking about his car keys, right?  Are we taking them?"  *Id.* at 19:15:20–19:15:24.  Sergeant Hiller, standing at the front of the patrol car, responded, "Yes."  *Id.* at 19:15:24–19:15:25; *see* Sept. 30 Tr. at 24, 39 (identifying Sergeant Hiller).

Officer French then walked over to the individual who had received the car keys from Williams's mother and said to him, "Sir, I'm afraid I'm going to have to seize those keys.  Would you please pass them off?"  Gov't's Ex. G at 19:15:26–19:15:31.  The man responded, skeptically, "Seize the keys?"  *Id.* at 19:15:31–19:15:33.  Officer French then extended his hand and said, "Keys, that were just handed to you."  *Id.* at 19:15:32–19:15:34.  Williams's friend did not immediately produce the keys.  *Id.*  Another officer then approached to join Officer French, and Officer French said, "I don't want to put my hands on you.  Please just turn them over."  *Id.* at 19:15:34–19:15:40.  As the man unzipped his pocket and slowly removed the keys, he asked, "Why am I giving y'all his keys?"  *Id.* at 19:15:40–19:15:44.  Officer French then immediately took the keys from the man's hand.  *Id.* at 19:15:44–19:15:45.  This set of keys included an electronic key fob.  *See* Def.'s Ex. 7 at 19:16:14–19:16:17, 19:16:30–19:16:45.

About 15 seconds after Williams's friend first placed the keys in his jacket pocket, and as Officer French was speaking with the friend, dispatch responded to Officer Schemmel to confirm

---

[3] These words are barely audible in the recording from Officer French's body-worn camera, and the record indicates that Officer French did not hear them; he said a moment later, "Say what?"  Gov't's Ex. G at 19:15:14–19:15:20.

that there was a valid, outstanding warrant for Williams's arrest. Gov't's Ex. B-2 at 19:15:36–19:15:44. Officer Schemmel then relayed that information to other officers on the scene and instructed, "Make sure we get those keys," *Id.* at 19:15:44–19:15:48. As it turned out, Officer French had taken the keys seconds before Officer Schemmel gave this instruction. *See* Gov't's Ex. G at 19:15:44–19:15:45; Gov't's Ex. B-2 at 19:15:46–48. Sergeant Hiller immediately told Officer Schemmel, "We got them." Def.'s Ex. 7 at 19:15:49–51.

Officer Schemmel then asked Officer Moore, who was sitting in the back seat of the patrol car, "Do we know where that car is?" Def.'s Ex. 7 at 19:06:06–19:06:08. Officer Moore responded, "No, I have no idea where that car is. I don't even know what car it is." *Id.* at 19:16:08–19:16:12. Officer Schemmel then asked over the radio, "Do we know what type of vehicle it is or where it is?" *Id.* at 19:16:12–19:16:14.

Officer French then handed the keys to Officer Schemmel, who passed them to Officer Moore. *Id.* at 19:16:14–19:16:17; *see also* Sept. 30 Tr. at 86. As Officer Schemmel was handing the keys to Officer Moore, he asked him, "You got that? I'm going to call a canine." Def.'s Ex. 7 at 19:16:16–19:16:18; Def.'s Ex. 8 at 19:16:16–19:16:18. Officer Moore then exited the patrol car with the keys, Def.'s Ex. 7 at 19:16:18–19:16:24, and Officer Schemmel radioed to request an assist from a police dog trained to detect the smell of smokeless gunpowder, which is the kind of gunpowder found in the cartridges of bullets, *see* Def.'s Ex. 8 at 19:16:22–19:16:49; Sept. 17 Tr. at 80.

### 4. Arrest and Statements in the Ambulance

Meanwhile, about ten seconds after Officer Schemmel alerted the officers to the outstanding warrant and after Officer French had taken the keys from Williams's friend, Officer Gaton placed Williams in handcuffs and told him that he was under arrest on an outstanding warrant. Gov't's Ex. C-5 at 19:16:00–19:16:24. At the time, Williams was lying in a stretcher

and being transferred into an ambulance.  *Id.*  Although the private ambulance that had arrived to take Williams to the hospital would no longer be able to transport him once he was under arrest, Officer Gaton directed that Williams be placed inside of that ambulance temporarily to create space from the crowd that had gathered around him.  Sept. 30 Tr. at 58–59.

While under arrest in the ambulance, Williams made several statements to the people gathered outside.  First, he called out, "Hey, Ma, hold my keys."  Gov't Ex. F-2 at 19:17:40–19:17:45.

Immediately after Williams made this statement, Officer Lamond Sparrow asked him, "Hey, sir, where's your car at?", and Williams responded, "I don't have no car."  Gov't Ex. F-2 at 19:17:45–19:17:47.  The officer then asked, "You don't have a car?", and Williams answered, "Nah."  *Id.* at 19:17:49–19:17:52.

A few moments later, Williams asked his mother, "They took the keys from you, huh?" *Id.* at 19:18:00–19:18:02.  When she responded in the affirmative, Williams said, "The car's parked on Third Street in the parking lot."  *Id.* at 19:18:02–19:18:06.  He went on to say, "Tell Black, 'Get my car to Third Street in the parking lot,'" apparently referring to the friend to whom he told his mother to give the keys.  *Id.* at 19:18:08–19:18:12.  Then, he repeated, "The car's on Third Street, in the parking lot.  Get my coat.  Hurry up, tell him, 'Go to Third Street, the car's in the parking lot.'"  *Id.* at 19:18:15–19:18:24.

### 5.  Discovery of the Car

As Williams was being placed under arrest and transferred into an ambulance, Officer Moore and another officer began searching for the car, walking first along Benning Road and then along H Street.  Def.'s Ex. 7 at 19:16:24–19:16:30; *see also* Sept. 30 Tr. at 84.  As he walked, Officer Moore held up the electronic fob attached to the car key he had received from Officer French and audibly clicked a button on the fob repeatedly, showing that he was trying to use the

10

key fob to find the car by causing it to illuminate or sound its horn. Def.'s Ex. 7 at 19:16:30–19:16:45, 19:16:50–19:17:04, 19:17:18–19:17:24, 19:17:31–19:17:38, 19:18:02–19:18:32. After about two minutes of searching along Benning Road and H Street in this manner, Officer Moore handed the keys to another officer and suggested that they continue searching at "the back." *Id.* at 19:18:33–19:18:37. The officers then walked together back in the direction of H Street, through a gate, and down a path leading to a dark parking lot in the rear of a building, where multiple cars were parked. *Id.* at 19:18:38–19:19:31. The officers knew from prior experience that stolen cars were sometimes found parked in this lot. *See* Sept. 17 Tr. at 31, 108; Sept. 30 Tr. at 73–74; Evidentiary Hr'g Tr. (Oct. 24, 2024) ("Oct. 24 Tr."), ECF No. 91, at 29–30.

At approximately 7:19 p.m., a car parked in this dark lot illuminated and made a sound in response to the key fob the officers were carrying. *Id.* at 19:18:38–19:19:32. Officer Moore and the officer accompanying him were at least two dozen feet from the car at the time its lights illuminated. *Id.* Because of the dark conditions where it was parked, the car would not have been clearly visible to the officers before its lights illuminated. *See id.* When the car responded to the key fob, Officer Moore immediately radioed Officer Schemmel and told him, "We've got the vehicle." *Id.* at 19:19:32–19:19:40.

Using flashlights, Officer Moore and the other officer then inspected the exterior of the car that had responded to the key fob. *Id.* at 19:19:48–19:21:14. That inspection showed that the car was a silver Honda Accord. *Id.* at 19:20:46. Officer Moore told other officers over the radio that the car was a Honda and provided the license plate number, but he did not give any indication that he recognized the vehicle. *Id.* at 19:20:36–19:21:10. Officer Moore then described over the radio the basis for his suspicion that the Honda contained a firearm, apparently to inform a decision about whether a police dog trained to detect the presence of firearms would respond to the scene.

11

*Id.* at 19:21:36–19:22:04. (As officers later testified, a police dog would not be deployed unless officers at the scene provided information supporting a "reasonable suspicion" of illegal activity. Sept. 30 Tr. at 87; *see also* Sept. 17 Tr. at 91–92.) In that radio call, Officer Moore described the circumstances of Williams's arrest and noted that the officers had retrieved the keys to the car, but he did not mention any other connection between Williams and the car. Def.'s Ex. 7 at 19:21:36–19:22:04.

As they waited for the police dog to arrive, the officers investigated other cars parked nearby. They discovered that one of those vehicles had recently been carjacked. *Id.* at 19:24:45–19:25:06.

Officer Schemmel arrived at the parking lot where the Honda was parked at approximately 7:28 p.m. *Id.* at 19:28:13–19:28:40. When Officer Schemmel arrived, Officer Moore told him about the Honda, "This is 100%. His car keys go to it," meaning that he was certain that Williams was associated with the car in some way. *Id.* Officer Moore did not mention any other information connecting Williams to the car. *See id.* When Sergeant Hiller arrived at the parking lot, Officer Moore told him that the Honda was "his car," referring to Williams, and said "the keys match it," without mentioning any other details connecting the car to him. *Id.* at 19:31:19–19:31:23.

After walking around the Honda and taking a picture of its license plate, Officer Schemmel asked Officer Moore, "Does this car come back to him?" *Id.* at 19:29:28–19:30:06. Officer Moore responded, "No, it doesn't." *Id.* at 19:30:06–19:30:08. Officer Schemmel then asked if the license plates were registered to the vehicle; Officer Moore said that they were not. *Id.* at 19:30:08–19:30:10. Officer Schemmel then read the car's vehicle identification number ("VIN") through its windshield and, using a computer in a patrol car, checked it against a database. *Id.* at 19:31:40–19:33:05. Moments later, he told other officers that the only result for the Honda was related to a

12

tow; he did not mention any indication that the car was associated with Williams. *Id.* at 19:33:16–19:33:21.

As it turned out, both Officer Moore and Officer Schemmel had previously encountered Williams in a silver Honda Accord matching the description of the one Officer Moore and another officer found using the key fob on November 30. *See* Oct. 24 Tr. at 50–51, 68. That previous encounter took place in mid-September 2023, approximately two and a half months before the investigation at issue in this case, and it did not result in an arrest. *See id.*

There was also a record of the Honda in a database that MPD officers use to track information about vehicles, which showed that the Honda was associated with Williams. *Id.* at 39–40. However, the officers did not discover that record during their investigation on November 30, in part because there was a typographical error in the VIN associated with that prior record, in which the letter "Q" had mistakenly been inserted in place of the digit "0." *See id.*; *see also* Def.'s Ex. 7 at 19:31:40–19:33:05, 19:33:16–19:33:21.

### 6. "Canine Sniff" and Discovery of the Firearm

Responding to the earlier call from Officer Schemmel, Officer John Holder and his "canine partner," a police dog named Titan,[4] arrived at the scene at approximately 7:50 p.m. Def.'s Ex. 4 at 19:50:25. Officer Moore then explained to Officer Holder the basis for the officers' suspicion that the Honda contained a firearm, including that the officers had recovered the keys to the car in connection with their investigation of Williams. *Id.* at 19:50:33–19:51:10. Officer Holder asked whether the car "comes back to" Williams and whether it had been reported as stolen; Officer

---

[4] The Government credibly established at an evidentiary hearing that Titan has received appropriate training and certification to perform his duties accurately and that he has completed and passed all of his required recertification tests. *See* Sept. 17 Tr. at 79–83; Gov't's Exs. J, K.

Moore responded that neither the car's license plates nor its VIN were associated with Williams, but that a search of the VIN indicated that the car had not been stolen. *Id.* at 19:51:24–19:52:50.

Officer Holder and Titan then conducted a "sniff" of the Honda, checking for the odor of smokeless gunpowder. Gov't Ex. H-2 at 19:57:18–19:57:45; Gov't Ex. I at 19:57:08–19:57:35; Sept. 17 Tr. at 80, 86–88. Officer Holder initiated the search from the driver's side door and proceeded counterclockwise around the car. Gov't Ex. H-2 at 19:57:16–19:57:41.

During the search, Titan briefly placed his feet on the car twice: first, immediately after the search began, when he jumped up and placed his front two feet on the front quarter of the car near the driver's-side mirror, and second, when he jumped up and placed his two front feet on the driver's-side door near the door handle. Gov't Ex. H-2 at 19:57:17–19:57:20. Each time, Titan quickly stepped down off the car. *Id.*

When Officer Holder and Titan reached the passenger side door, Titan sat down, indicating to Officer Holder that he had detected the odor of smokeless gunpowder. Gov't Ex. I at 19:57:23–19:57:28; Sept. 17 Tr. at 88–90. Titan did not place his feet on the passenger's side of the car at any point. *See* Gov't Ex. I at 19:57:23–19:57:28.

After Titan indicated the presence of smokeless gunpowder, Officer Moore used the car keys to unlock the Honda.[5] Gov't Ex. H-2 at 19:57:60– 19:58:02. Officers then searched the car, including its glovebox. *Id.* at 19:57:42–19:59:22.

In the glovebox, the officers discovered a handgun matching the description of the gun Officer Schemmel saw Williams brandishing in the Instagram Live video posted on November 29. *Id.* at 19:59:15–19:59:22.

---

[5] As Officer Schemmel explained during the evidentiary hearing, if the officers had not had the car keys, they would eventually have been able to unlock the Honda using a "lock-out kit," which is always available to them while on patrol. Oct. 24 Tr. at 20–21.

### B.    Disputed Issues of Fact

Most of the relevant facts in this case are undisputed.  After considering all the evidence and the parties' arguments, the Court concludes that there are just two relevant issues on which the parties have drawn different factual inferences from the evidence: whether Officer Gaton made physical contact with Williams when he first reached to grab him, and whether either Officer Schemmel or Officer Moore remembered during the investigation on November 30 that they had previously encountered Williams in a silver Honda Accord.  The Court resolves these two issues as follows.

First, the Court finds that Officer Gaton did not make physical contact with Williams before he fled into traffic on Benning Road.  Although Williams argued in his original Motion to Suppress Tangible Evidence that Officer Gaton had "grabbed" him, *see* Def.'s Mot. I at 4–5, careful review of video recorded at the scene by multiple officers' body-worn cameras shows that Officer Gaton did not make physical contact with Williams until after he had fled and been struck by a car.  *See* Gov't's Ex. C-1 at 18:43:24–18:43:30; Gov't's Ex. D at 18:43:24–18:43:30; Gov't's Ex. E at 18:43:24–18:43:30.

Second, the Court finds that neither Officer Schemmel nor Officer Moore remembered on November 30 that they had previously encountered Williams in a silver Honda Accord.  Officer Schemmel's testimony was consistent with this conclusion.  Counsel suggested in a supplemental brief that both Officers Schemmel and Moore knew on November 30 that Williams drove a Honda Accord and proffered that Officer Schemmel "would have been able to identify the defendant's car without the car keys" recovered from his friend.  *See* Gov't's Second Supp. Br. at 5–7.  Counsel may have assumed that Officer Schemmel would have been able to remember on November 30 that he had previously encountered Williams in a similar Honda, but Officer Schemmel did not claim on the record to have remembered that fact at the time, and he ultimately did not testify that

he would have been able to identify the Honda from memory as Williams's car. Video from both officers' body-worn cameras ultimately supports the conclusion that on November 30, neither officer recognized the silver Honda Accord found parked nearby as Williams's car, and neither remembered previously having seen him drive a vehicle matching its description.

Video evidence shows that after Officer Moore and another officer located the Honda using the car keys, both Officer Moore and Officer Schemmel spent several minutes inspecting the exterior of the car. *See* Def.'s Ex. 7 at 19:19:48–19:21:14, 19:29:28–19:30:06. Officer Schemmel also examined the car's license plate and VIN and searched for information about the car in a database. *See id.* at 19:29:28–19:30:06, 19:31:40–19:33:05. Neither Officer Schemmel nor Officer Moore mentioned recognizing the car at any point during or after these investigations, including when describing to other officers what information they had about the car and its connection to their ongoing investigation of Williams. *See, e.g.*, Def.'s Ex. 7 at 19:21:36–19:22:04, 19:28:13–19:28:40, 19:30:06–19:30:10, 19:31:19–19:31:23, 19:33:16–19:33:21; Def.'s Ex. 4 at 19:50:33–19:51:10, 19:51:24–19:52:50.

The Court finds that if Officer Schemmel or Officer Moore had recognized the Honda from their prior encounters with Williams, they would have mentioned that fact to each other or to other officers at the scene because it was directly relevant to their ongoing investigation. Because body-worn camera footage shows that the officers did not mention recognizing the car, and in light of all the other evidence introduced in this case, the Court concludes that neither Officer Schemmel nor Officer Moore remembered on November 30 that they had previously encountered Williams in a silver Honda Accord.

## II. LEGAL STANDARDS

The Fourth Amendment guarantees "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

To secure this right, the Supreme Court has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). Specifically, when it applies, this rule "prohibits the [G]overnment from introducing in its case in chief evidence obtained in violation of the Fourth Amendment." *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015). The rule applies only when (1) there is a causal link between the constitutional violation and the acquisition of the evidence and (2) applying the exclusionary rule would "result in appreciable deterrence" of unlawful searches or seizures such that the benefits of that deterrence outweigh the social costs of exclusion. *Id.* at 42–43; *see also Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").

When a defendant moves to suppress evidence under the Fourth Amendment exclusionary rule, he bears the burden of establishing "that the search or seizure was illegal" and making "a prima facie showing of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress." *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007). "After the defendant has met his burden, the evidence must be suppressed unless the government proves, by a preponderance of evidence, that the evidence would have been discovered inevitably, was discovered through independent means, or that its discovery was so attenuated from the illegal search or seizure that the taint of the unlawful government conduct was dissipated." *Id.* at 1293. When the Government argues that the evidence at issue is admissible because it would inevitably have been discovered even without the unlawful search or seizure, the Court's analysis of that theory "involves no speculative elements" and instead "focuses on demonstrated historical facts

capable of ready verification or impeachment." *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984); *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007).

The Fifth Amendment guarantees the privilege not to "be compelled in any criminal case to be a witness against [one]self." U.S. Const. amend. V. To protect that right, the Supreme Court has held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These safeguards include a requirement that the defendant "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. Unless the Government can prove that the defendant received such a warning and subsequently waived his rights knowingly and intelligently, "no evidence obtained as a result of interrogation can be used against him" in the Government's case-in-chief at trial, *id.*, although it may be used to impeach his credibility if he takes the stand in his own defense, *Harris v. New York*, 401 U.S. 222, 226 (1971). A "custodial interrogation," for purposes of the *Miranda* rules, is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 479. The term encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

### III. DISCUSSION

After considering all the evidence and arguments the parties have raised to date regarding the factually and legally complex evidentiary issues in this case, the Court concludes that nearly

all of officers' challenged actions were lawful and do not warrant suppression.  However, after careful analysis of various legal issues and theories that may not have been readily apparent to the officers that were in the field on the night at issue, the Court concludes that the officers seized a set of car keys without lawful authority and relied on those car keys for subsequent investigative steps that led them to discover the handgun for which Williams is charged in this case.  Because this seizure was unlawful and the conditions for the application of the Fourth Amendment exclusionary rule are satisfied, the Court shall **GRANT** Williams's Motion to Suppress Tangible Evidence.  And because officers elicited two brief statements from Williams while he was under arrest without first providing a *Miranda* warning, the Court shall also **GRANT IN PART** Williams's Motion to Suppress Statements and exclude certain statements from presentation during the Government's case-in-chief at trial.

### A.    Timing of *Terry* Stop and Arrest

Because the investigation at issue in the pending motions proceeded in multiple steps and the legal standards applicable at each step depend in part on exactly when and for what purpose the officers seized Williams, the Court begins by determining when Williams was first seized for a *Terry* stop and when that stop became an arrest requiring probable cause.  As the party challenging seizure, Williams "bears the burden of demonstrating that he was seized."  *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (quoting *United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016)).

### 1.    Williams was seized only after he fled into traffic.

The first relevant issue is when Williams was seized for a *Terry* stop.  The Court concludes that Williams was seized only after he fled into traffic, when, at approximately 6:43 p.m., multiple officers surrounded him and began to pat him down.  Williams argues, to the contrary, that he was seized moments earlier when Officer Gaton told him, "Come here, sir," and reached to grab him.

He advances two theories in support of this argument.  First, he argues that Officer Gaton seized him by making physical contact with him.  Second, he argues that Officer Gaton's verbal command, together with the presence of multiple uniformed officers and patrol cars on scene, amounted to a seizure by "show of authority."  Neither of these arguments succeeds.

*First*, contrary to Williams's argument, Officer Gaton did not make physical contact with Williams before he fled.  Williams is correct that a Fourth Amendment seizure occurs whenever a police officer makes "physical contact" with a suspect "with intent to restrain," regardless of whether the suspect stops or otherwise submits in response to the contact.  *Torres v. Madrid*, 592 U.S. 306, 317 (2021).  But because the Court finds that Williams successfully evaded Officer Gaton and the officer did not make physical contact with him before he fled, Williams was not seized in this way and must show a seizure by some other means.

*Second*, Officer Gaton's verbal command and the presence of multiple uniformed officers and patrol cars on the scene did not amount to a seizure by "show of authority."  As the United States Court of Appeals for the District of Columbia Circuit recently reiterated, the show of authority inherent in "the presence of multiple officers" does not by itself turn a routine police encounter into a Fourth Amendment seizure.  *United States v. Bryant*, 111 F.4th 105, 111 (D.C. Cir. 2024) (quoting *United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007)).  Instead, a "seizure occurs when police officers use a 'show of authority' to which an individual yields."  *Id.* at 109 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  If the individual does not "voluntarily submit to a show of authority" and the officers have not "blocked his path" or seized him by some other means, there is no seizure.  *United States v. Veney*, 45 F.4th 403, 406 (D.C. Cir. 2022).  Here, Williams did not yield or submit to Officer Gaton, and his path was not blocked; instead, he

successfully fled beyond Officer Gaton's reach. Therefore, he was not seized before taking flight, but only moments afterward, when multiple officers surrounded and eventually handcuffed him.

2.  <u>Williams was arrested only after Officer Gaton told him he was under arrest on an outstanding warrant.</u>

The second relevant issue is when Williams was placed under arrest, requiring probable cause for his seizure. The Court concludes that Williams was under arrest only after, at approximately 7:16 p.m., Officer Gaton placed him in handcuffs a second time and told him that he was under arrest on an outstanding warrant. Williams suggests that the initial *Terry* stop effectively transformed into an arrest sometime earlier, after the officers patted him down and concluded that he was not carrying any weapons or readily detectable contraband, but this theory fails because the scope and duration of the *Terry* stop was reasonable under the circumstances.

The Supreme Court has recognized that there is "no rigid time limitation on *Terry* stops." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). Instead, "the permissible scope and duration of a *Terry* stop necessarily varies with the circumstances in each case." *United States v. Hutchinson*, 408 F.3d 796, 799–800 (D.C. Cir. 2005). While "'the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion,'" courts also must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (quoting *United States v. Place*, 462 U.S. 696, 709 (1983)).

Here, the legitimate purposes for stopping Williams included not only confirming whether he was carrying a dangerous weapon, but also investigating the traffic accident in which a vehicle struck him on Benning Road SE, checking for outstanding warrants, providing an emergency medical assessment at the scene, and eventually—with Williams's consent—arranging for him to

be transported to a hospital. The total length of the investigative stop, which began at approximately 6:43 p.m. and ended no later than 7:16 p.m. when Williams was placed under arrest, was reasonable for these purposes.

The record shows the officers briefly placed Williams in handcuffs because he was actively resisting their attempts to perform a pat down, then removed them approximately two minutes later. Gov't's Ex. C-3 at 18:43:37-18:45:50. As he was removing the handcuffs, Officer Gaton told Williams—over the shouts of a growing crowd of bystanders that had gathered around the officers—"We just need the ambulance to check you out. You can't go, alright? You've gotta stay sitting down here." *Id.* at 18:45:48–18:46:04. Officer Gaton also told Williams that he would need to provide his information to another officer so that they could complete an accident report. *Id.* at 18:46:10–18:46:17. EMTs arrived a few minutes later, at approximately 6:51 p.m., to assess Williams, and Williams told them that he wanted to go to the hospital. *See* Def.'s Ex. 7 at 18:51:06–18:52:08, 18:52:36–18:52:46; Gov't's Ex. F-3 at 18:53:33–18:53:44. About 15 minutes after that, while the officers were waiting for the ambulance to arrive and take Williams to the hospital, Officer Schemmel performed the check for outstanding warrants that ultimately led to Williams's arrest. *See* Gov't's Ex. B-2 at 19:08:50–19:11:30.

Despite Williams's suggestion, with the benefit of hindsight, that the officers might have completed the necessary investigative steps more quickly, the Supreme Court has warned that in this context, courts must not "indulge in unrealistic second-guessing" of the decisions that law enforcement officers make in the field. *Sharpe*, 470 U.S. at 686. Accordingly, the Court concludes that, "given the circumstances facing [them]," the officers "pursued [their] investigation in a diligent and reasonable manner" and the scope and duration of the investigative stop therefore did not exceed the permissible bounds of a *Terry* stop based only on reasonable suspicion. *See id.*

**B.    Analysis of Investigative Steps**

    1.  <u>The initial *Terry* stop was lawful because the officers had a reasonable, articulable suspicion of illegal activity when they stopped Williams.</u>

Williams argues that the initial *Terry* stop was unlawful, but this argument fails.  The record shows that the initial *Terry* stop was lawful because, at the time of the stop, the officers had reasonable suspicion that Williams was unlawfully carrying a firearm.

A person may lawfully be "detained briefly," even without probable cause for arrest, if a police officer has "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980).  The Government carries the burden "to provide evidence sufficient to support reasonable suspicion justifying any such stop." *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016).

As the Court concluded above, Williams was "seized" for a *Terry* stop only after he fled from Officer Gaton into traffic.  Several facts, taken together, gave the officers reasonable suspicion of illegal activity that was sufficient to support this stop.  First, the previous day, Officer Schemmel had observed Williams brandish a firearm in a video published on Instagram Live, and Officer Schemmel knew at the time that Williams was not lawfully permitted to possess a firearm.  Second, when Officer Schemmel first approached Williams on the evening in question, Williams's behavior seemed "unusual" to Officer Schemmel, who had previous experience with him.  Specifically, in Officer Schemmel's experience, Williams would usually have "casual" and "friendly" conversation with him, but shortly before the stop, Williams walked past Officer Schemmel without speaking to him and while appearing to record video using his cell phone.  Third, when Officer Gaton told Williams to "come here," Williams fled into traffic, placing his own safety and the safety of others at risk to avoid being stopped by law enforcement.  Taken together, these facts were sufficient to give the officers reasonable suspicion to believe that

Williams was unlawfully carrying a firearm at the time of the initial *Terry* stop, rendering the stop lawful.

      2.  <u>The officers did not unlawfully extend the *Terry* stop.</u>

Williams argues that the officers unlawfully extended the *Terry* stop for longer than necessary and should have released him.  But for all the same reasons that the Court concluded above that the *Terry* stop did not become an arrest requiring probable cause until Williams was validly arrested on an outstanding parole warrant, the Court concludes that the officers did not unlawfully extend the *Terry* stop beyond its permissible scope.  The officers initially stopped Williams for long enough to confirm that he was not carrying a dangerous weapon, complete an accident report regarding the collision with the vehicle that struck him on Benning Road SE, conduct an initial medical assessment, and run a warrant check.  After Williams told EMTs that he wanted to be transported to the hospital, officers waited with him for an ambulance to arrive to complete that transfer.  As stated above, the Court will not "indulge in unrealistic second-guessing" of the officers' decisions by speculating that these steps could or should have been completed more quickly.  *Sharpe*, 470 U.S. at 686.  The Court concludes that the officers did not unlawfully extend the initial *Terry* stop beyond its permissible scope or duration.

      3.  <u>The seizure of the keys from Williams's friend was unlawful because the officers did not have probable cause to believe that the keys were evidence of a crime and the "plain view" doctrine did not apply.</u>

Williams's strongest argument for suppression of the handgun retrieved on November 30 is that the officers unlawfully seized the keys to the car from which the handgun was recovered. The Government does not argue that the officers had probable cause to believe the keys were evidence of a crime when they seized them.  *See* Gov't's Second Supp Br. at 1–5.  Instead, the Government argues that the seizure was lawful because the keys were briefly in "plain view" of the officers on the scene and because, during their investigation, the officers later discovered

24

evidence showing that the keys were incriminating. *Id.* Williams contends that the "plain view" doctrine is inapplicable here, that the seizure of the keys would be consistent with the Fourth Amendment only if the officers had probable cause to believe the keys were evidence of a crime at the time of seizure, that the officers did not have probable cause at the time, and that the seizure was therefore unlawful. Def.'s Second Supp. Br. at 1–4. On this issue, the Court agrees with Williams.

The "plain view" doctrine operates as a limited exception to the general rule that the Government must obtain a warrant before seizing a person's property as evidence. *Horton v. California*, 496 U.S. 128, 133–34 (1990). The Government argues that the plain view doctrine allows seizure without a warrant when three conditions are satisfied: (1) the officer conducting the seizure was lawfully present at the time of seizure; (2) the item seized was in plain view at the time it was discovered; and (3) the item's incriminating character was "immediately apparent" to the officer. Gov't's Second Supp. Br. at 2 (quoting *Horton*, 496 U.S. at 133). Citing D.C. Circuit precedent, the Government argues that "though '"immediately apparent" sounds temporal,' its 'true meaning' is that 'the incriminating nature of the item must have become apparent, in the course of the search, without the benefit of information from any unlawful search or seizure.'" *Id.* (quoting *United States v. Garces*, 133 F.3d 70, 75 (D.C. Cir. 1998)). Applying these rules, the Government argues that the seizure of the keys was lawful because (1) the officers were lawfully present on the scene, (2) the keys were in plain view a few moments prior to seizure, and (3) the incriminating nature of the keys became apparent during the officers' lawful investigation. *Id.* at 2–3.

The Government's argument fails because it elides one essential condition for the application of the "plain view" doctrine that was not satisfied here: The doctrine allows officers

to seize an object without a warrant only if, in addition to the conditions the Government recites, the officers "have a lawful right of access to the object" at the time of seizure. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see also Horton*, 496 U.S. at 142 (noting that "plain view" doctrine "merely authorizes an officer with a lawful right of access to an item to seize it without a warrant"). Consistent with this rule, the "plain view" doctrine does not allow the seizure of evidence that is "visible from a public vantage point" if officers do not have a "lawful right" to access the evidence itself. *See United States v. Dubose*, No. 05-cr-372, 2006 WL 1876999, at *13 (D.D.C. July 5, 2006) (JDB) (granting motion to suppress evidence seized by way of trespass on private property because officers lacked "lawful right of access" to the evidence, even though evidence was "in open view" from a "public street").

In the principal case on which the Government relies, *United States v. Garces*, 133 F.3d 70 (D.C. Cir. 1998), the "lawful right of access" requirement was satisfied because the officers found the object at issue—a car key—while executing a valid search warrant allowing them to search the home of a suspect's relative. *Id.* at 72. The officers obtained the homeowner's express, written consent to search a car parked outside the home, which they did using the key they had discovered. *Id.* The Court of Appeals rejected the suspect's Fourth Amendment challenge to the seizure and use of the key on the basis that "the only reasonable reading of the aunt's consent to search the car is that it included consent to use the key." *Id.* Taken together, the search warrant and that consent provided a clear "lawful right of access" to the key. *See id.*

In this case, unlike in *Garces*, the officer who seized the keys at issue did not have an independent "lawful right of access" to the keys at issue. Williams entrusted the keys to his mother and then to his friend. The friend then secured the keys, out of view, in a zippered pocket. And the record makes clear that the friend did not voluntarily turn over the keys; he did so only after

an officer threatened him with force. *See* Gov't's Ex. G. at 19:15:34–19:15:45. Under these circumstances, Williams's Fourth Amendment right to be "secure" in his "effects" extended to his ongoing possessory interest in the keys secured in his friend's jacket pocket, and taking the keys was a seizure implicating Williams's own Fourth Amendment rights.[6] *See* U.S. Const. amend. IV; *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."); *United States v. Place*, 462 U.S. 696, 701 (1983) (noting that, subject to some exceptions, "the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant"). At the time of this seizure, the officers did not have a warrant to search or seize property from Williams or his friend, and no exception to the warrant requirement applied. As Williams correctly notes, the "search incident to arrest" exception to the warrant requirement extends only to the area within the arrestee's immediate control, and Williams's friend was far beyond his reach at the time of the seizure. *See* Def.'s Suppl. Reply at 4; *Chimel v. California*, 395 U.S. 752, 762–63 (1969). The officers therefore did not have a "lawful right of access" to the keys, the "plain view" doctrine did not apply, and the keys could not be seized without probable cause.

Because the Government has not argued or shown that the officers had probable cause to seize the car keys from Williams's friend, and because the Government has not shown that the

---

[6] Neither party has raised the issue of whether Williams has standing to raise a Fourth Amendment challenge to the seizure of the keys from his friend. The Court concludes that he does have standing to challenge this seizure, even though the keys were seized from another person. As the Supreme Court has recognized, by its plain language, the Fourth Amendment "protects property as well as privacy." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 62 (1992). Accordingly, even if Williams would not have had standing to assert his friend's right to *privacy* in the contents of his jacket pockets, *cf.* ; *United States v. Askew*, 529 F.3d 1119, 1144 (D.C. Cir. 2008) (holding that officers violated suspect's Fourth Amendment rights by "unzipping his jacket without his permission and without probable cause or a warrant"), Williams has his own, independent Fourth Amendment right against unlawful interference with his possessory interest in his personal *property*, including the keys he entrusted to his friend, *see Soldal*, 506 U.S. at 63–64; *see also United States v. Place*, 462 U.S. 696, 705 (1983) (noting that seizure affecting Fourth Amendment interests "may be made after the owner has relinquished control of the property to a third party," as it was in this case).

officers had a "lawful right of access" to the keys that supports the application of the "plain view" doctrine, the Court concludes that the seizure of the car keys that Williams's friend had secured in his jacket pocket was unlawful because it violated Williams's Fourth Amendment right against unreasonable searches and seizures.

> 4.  <u>Williams's statements denying that he had a car were elicited during a custodial interrogation without a *Miranda* warning, but his other statements while under arrest were spontaneous.</u>

Williams briefly argues that the Court must suppress "any statements made by Mr. Williams" on November 30, 2023, on the basis that the Government elicited those statements in violation of the Fifth Amendment. *See* Def.'s Mot. II at 1–2. Although Williams does not identify specific statements that should be suppressed, the Court concludes that there was only one instance on November 30 in which Williams made statements in response to "words or actions on the part of the police . . . that the police should [have known were] reasonably likely to elicit an incriminating response." *See Innis*, 446 U.S. at 301. As described above, while Williams was under arrest and being held in the ambulance, Officer Sparrow asked him where his car was located, to which Williams responded that he did not have a car. Gov't Ex. F-2 at 19:17:45–19:17:47. Officer Sparrow then asked Williams whether he had a car, and Williams answered that he did not. 19:17:49–19:17:52. No one gave Williams a *Miranda* warning before Officer Sparrow asked these questions. *See Miranda*, 384 U.S. at 479.

Because the officers were actively searching for Williams's car in pursuit of evidence of a crime at the time that Officer Sparrow asked these questions, the questions were "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. Accordingly, in the absence of a *Miranda* warning, "no evidence obtained as a result of" this questioning, including the direct responses to the questions themselves, can be used at trial in the Government's case-in-chief against Williams. *Miranda*, 384 U.S. at 479. However, if Williams chooses to take the stand in

his own defense, the Government may rely on these responses as prior inconsistent statements to impeach his credibility. *See Harris*, 401 U.S. at 226.

Apparently recognizing the inadmissibility of Williams' statements in response to these questions, the Government states that it does not intend to rely on them in its case-in-chief. *See* Gov't's Opp'n II at 5. However, the Government argues persuasively that the other statements that Williams made around the same time as he was responding to Officer Sparrow are admissible because they were not made "in response to any police questioning." *United States v. Sheffield*, 832 F.3d 296, 306 (D.C. Cir. 2016); *see* Gov't's Opp'n II at 3. For example, the Government argues that Williams's statement to a bystander that "[t]he car's parked on Third Street in the parking lot" is admissible because it was made spontaneously and not in response to Officer Sparrow's questions. Gov't's Opp'n II at 3; Gov't's Ex. F-2 at 19:18:02–19:18:06.

The Court agrees with the Government that Williams's other statements were not made in response to police questioning and that the protections of *Miranda* therefore do not apply to those statements. Accordingly, the Court shall grant Williams's Motion to Suppress Statements as to his two direct responses to Officer Sparrow in which he denied that he had possession of a car but shall deny the Motion to Suppress Statements in all other respects.

5.  <u>Apart from their connection to the unlawful seizure of the keys, neither the "canine sniff" of the car nor the subsequent search of the car's interior were unlawful searches triggering the Fourth Amendment exclusionary rule.</u>

Finally, Williams argues that the "canine sniff" and subsequent search of the interior of the Honda were independently unlawful and require suppression, regardless of whether the officers lawfully obtained the keys that led them to investigate the Honda. Def.'s Mot. I at 6–8. He advances four arguments in support of this theory, but each fails.

*First*, Williams argues that because items associated with the odor of smokeless gunpowder are non-contraband in the hands of some people, a canine sniff calculated to detect them requires

probable cause.  *Id.* at 6–7.  An investigation is a search requiring probable cause when the investigation "violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001).  "[G]overnmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest," *Illinois v. Caballes*, 543 U.S. 405, 408 (2005), but Williams is correct that firearms are not always "contraband" because some people may lawfully possess them.  However, because Williams himself is not legally permitted to possess a firearm, a sniff of his property for the odor of smokeless gunpowder did not invade any reasonable expectation of privacy and therefore was not a search requiring probable cause.  *See Kyllo*, 533 U.S. at 33.  For his argument to the contrary, Williams relies on *People v. McKnight*, 446 P.3d 397 (Colo. 2019), in which the Colorado Supreme Court held that a sniff by a police dog trained to detect both narcotics and marijuana—the latter of which had been legalized as a matter of state law—was a search under the Fourth Amendment because the sniff violated a legitimate privacy interest in possessing a substance that was legal under state law.  *See id.* at 408. But here, in contrast to the situation in *McKnight*, the dog sniff at issue was calculated to detect only something that officers knew that the suspected owner of the car to be sniffed had no right to possess.  *Cf. Kyllo*, 533 U.S. at 38 (concluding imaging device that could detect lawful as well as unlawful activity in the home was a search requiring probable cause).  Accordingly, the sniff was a "limited" investigation that did not violate any legitimate expectation of privacy and was not a search requiring probable cause.  *See United States v. Place*, 462 U.S. 696, 707 (1983); *see also United States v. Sparks*, 594 F. Supp. 3d 9, 24 (D.D.C. 2022) (RC) (holding that canine sniff that was "minimally intrusive and limited in scope" required only reasonable suspicion, not probable cause).

*Second*, Williams argues that because Titan, the police dog, made physical contact with the car, the sniff was a search requiring probable cause because it amounted to a trespass against his property for the purpose of obtaining information. Def.'s Mot. I at 6–7 (citing *United States v. Jones*, 565 U.S. 400, 407–08 (2012)). But Titan made physical contact with the car only briefly, on the driver's side of the car, and there is no indication in the record that this contact was causally linked to Titan's alert on the passenger side of the car or the resulting discovery of the firearm. Because the Fourth Amendment exclusionary rule only applies "when the constitutional violation is 'a but-for cause of obtaining evidence,' provided that causal connection is not 'too attenuated,'" *Weaver*, 808 F.3d at 34 (quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)), the rule does not apply here. Any causal connection between the Titan's physical contact with the car and the discovery of the handgun was, at best, highly attenuated. Therefore, even if the physical contact was inconsistent with the Fourth Amendment, that contact was not causally linked to the discovery of any evidence and does not trigger the exclusionary rule.

*Third*, Williams argues that even if the canine stiff of the parked car at issue here could be conducted based only on reasonable suspicion, the officers did not have reasonable suspicion that the car contained evidence of a crime at the time of the "sniff." *See* Def.'s Mot. I at 7. However— setting aside, for purposes of this analysis, the fact that the keys were seized unlawfully—the officers did have at least reasonable suspicion that the Honda contained evidence of a crime at the time they conducted the sniff. After observing Williams brandish a firearm on Instagram Live the day before, then attempt to flee from officers who attempted to stop him, then pass off the keys to the car to another person, and finally give misleading instructions that his car was parked on "Third Street," it was reasonable for the officers to suspect that the car associated with the keys Williams was carrying contained a firearm. Because Williams may not lawfully possess a firearm, that

suspicion amounted to reasonable suspicion that the car contained evidence of a crime. That suspicion was adequate to support the canine sniff. *See Sparks*, 594 F. Supp. at 24.

*Fourth*, Williams briefly argues that even the sniff at issue here was lawful, the result of that investigation did not provide probable cause to search the interior of the car. Def.'s Mot. at 7–8. When assessing whether a police dog's alert amounts to probable cause for a search, the question for the court "is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013). "If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." *Id.* Here, the Government made exactly that showing at an evidentiary hearing, and Williams did not contest the Government's evidence of reliability. *See* Sept. 17 Tr. at 79–83. Accordingly, the Court finds that Titan's alert was reliable and concludes that—again setting aside, for purposes of this analysis, the fact that the keys were seized unlawfully—Titan's alert would have provided probable cause to search the interior of the Honda for a firearm.

In sum, none of Williams's four arguments regarding the canine sniff and subsequent search of the interior of the Honda amounts to an independent basis for suppression.

### C.    Whether the Exclusionary Rule Applies

Having decided that the seizure of the keys from Williams's friend was unlawful, the Court must decide whether the exclusionary rule bars evidence discovered as a result of that unlawful seizure. As explained earlier, the Fourth Amendment exclusionary rule applies only when (1) there is a causal link between the constitutional violation and the acquisition of the evidence and (2) applying the exclusionary rule would "result in appreciable deterrence" of unlawful

searches or seizures such that the benefits of that deterrence outweigh the social costs of exclusion. *Weaver*, 808 F.3d 26, 42–43 (D.C. Cir. 2015).

Applying these standards, the Court concludes that there was a causal link between the seizure of the keys and the discovery of the car and handgun and that the officers would not inevitably have discovered the car and handgun without the unlawful seizure.  The Court further concludes that—while the issue is close—the unlawful seizure of the keys at issue here is the kind of conduct that can be "meaningfully" deterred by the application of the exclusionary rule and that "such deterrence is worth the price paid by the justice system."  *Herring*, 555 U.S. at 144. Accordingly, the Court holds that evidence discovered as a result of the unlawful seizure of the car keys shall be suppressed from introduction in the Government's case-in-chief at trial.

1. The discovery of the handgun in the car was causally linked to the unlawful seizure of the keys.

The Supreme Court has recognized three ways in which "the causal relationship between the unconstitutional act and the discovery of evidence" can be interrupted such that the exclusionary rule does not apply.  *See Utah v. Strieff*, 579 U.S. 232, 238 (2016).  First, evidence discovered as a result of an unlawful search is admissible "if officers independently acquired it from a separate, independent source."  *Id.* (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)).  Second, under the "inevitable discovery" doctrine, evidence is admissible if it "would have been discovered even without the unconstitutional source."  *Id.* (citing *Nix*, 467 U.S. at 443–444).  Third, under the "attenuation" exception, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"  *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).  Because the officers in this case did not discover

the handgun through "a separate, independent source" apart from the keys and the connection between the seizure of the keys and the recovery of the handgun was neither "remote" nor "interrupted by some intervening circumstance," only the "inevitable discovery" exception is at issue here. *See id.*

The inevitable discovery doctrine "involves no speculative elements" and instead "focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5; *see also Holmes*, 505 F.3d at 1293. Accordingly, the Court's analysis of whether officers would "inevitably" have discovered the handgun in the glove box of the Honda focuses on the "demonstrated historical facts," without relying on speculation about what the officers might have done under different circumstances.

The Government argues that because the officers were familiar with Williams and the area where he was arrested, they inevitably would have discovered the Honda and the handgun concealed in its glovebox even if they did not have the keys. However, several facts show that, without the keys, discovery of the handgun was not inevitable here.

First, the evidence shows that neither Officer Schemmel nor Officer Moore remembered on November 30 that they had previously encountered Williams in a silver Honda Accord. *See supra*, Section II.B. Therefore, neither officer would have been able to recognize the vehicle as belonging to Williams by sight alone if it had not responded to the electronic key fob recovered from Williams's friend.

Second, there was a typographical error in the VIN associated with the only database record that the officers could have used to connect the Honda to Williams, which would have interfered with the officers' ability to connect Williams to the car by other means—as demonstrated by the fact that Officer Schemmel searched for the car's VIN on November 30 and failed to find the

record associating Williams with the car. *See* Def.'s Ex. 7 at 19:31:40–19:33:05, 19:33:16–19:33:21.

Third, the Honda was parked in a dark parking lot, reducing the chances that even an officer who did know what type of car Williams was likely to be driving would have found that car without the key fob. *See* Def.'s Ex. 7 at 19:18:38–19:19:32.

Fourth, the officers' testimony at the evidentiary hearing shows that, as a factual matter, MPD officers would not have conducted a "canine sniff" of the Honda for the odor of smokeless gunpowder without reasonable suspicion that the car contained evidence of a crime. Sept. 30 Tr. at 87; *see also* Sept. 17 Tr. at 91–92. And the officers' statements during their investigation, including their statements made to support their requests for a "canine sniff," show that they relied on the keys to connect the Honda with Williams and provide that reasonable suspicion, even after spending several minutes on the scene inspecting the exterior of the car, its license plate, and its VIN to develop other information relevant to their investigation. *See, e.g.*, Def.'s Ex. 7 at 19:21:36–19:22:04; Def.'s Ex. 4 at 19:50:33–19:51:10, 19:51:24–19:52:50. For example, when Officer Moore explained the basis for the officers' suspicions to Officer Holder at the scene, the car keys were the only detail he mentioned that connected Williams with the car, even after Officer Holder asked whether the car "comes back to" Williams. *See* Def.'s Ex. 4 at 19:50:33–19:51:10, 19:51:24–19:52:50.

Collectively, these facts show that it was not "inevitable" that, without the keys, officers would discover the location of the Honda, develop reasonable suspicion that it contained evidence of a crime, and conduct the "canine sniff" that ultimately led to the discovery of the handgun at issue in this case.

The Government has elicited a handful of facts that show how it might have been possible for the officers to locate and seize the handgun without the benefit of the keys, but the alternative path to discovery suggested by the Government's evidence does not show that discovery was "inevitable" without the benefit of any "speculative elements." *See Nix*, 467 U.S. at 444 n.5; *Holmes*, 505 F.3d at 1293. The facts supporting the most likely alternative path to discovery are as follows: First, when Officer Schemmel and Officer Moore first saw Williams on November 30, he was walking from the general direction of the parking lot where the Honda was eventually found. *See* Gov't's Ex. B-1 at 18:42:20–18:42:27. Second, the officers knew from prior experience that stolen cars were sometimes found parked in this lot. *See* Sept. 17 Tr. at 31, 108; Sept. 30 Tr. at 73–74; Oct. 24 Tr. at 30. Third, on November 30, one of the vehicles parked in that lot near the Honda had in fact been reported as stolen. *See* Def.'s Ex. 7 at 19:24:45–19:25:06. Fourth, Officer Schemmel testified that when his team discovers a stolen vehicle, its next course of action is to investigate all the vehicles "next to or near them" to determine whether those vehicles have also been stolen or contain evidence of crimes in plain view. Oct. 24 Tr. at 34.

These facts support an inference that if the officers had not seized the keys to the Honda, their investigation might nonetheless have led them to the lot where it was parked, and they might have eventually investigated the exterior of the Honda itself because it was parked near a vehicle that had been reported as stolen. However, for the reasons described above, merely investigating the exterior of the Honda would not inevitably have led to the discovery of the handgun. Neither the license plates nor the VIN of the Honda were directly associated with Williams in the officers' databases, and none of the officers on scene recognized the car by sight, so the officers would not have immediately developed the reasonable suspicion on which they relied to conduct a "canine sniff" and discover the handgun. And although it is theoretically possible that officers would

36

eventually have recognized the typographical error in the VIN recorded in a database entry that connected the Honda with Williams, that possibility is speculative. Given that Officer Schemmel in fact ran a database search for the Honda's VIN on November 30 and did not discover the connection to Williams during that search, the "demonstrated historical facts capable of ready verification or impeachment" do not support the conclusion that the officers would inevitably have discovered this connection during a broader search of the area for a vehicle associated with Williams. *See Nix*, 467 U.S. at 444 n.5; *see also Holmes*, 505 F.3d at 1293.

In sum, the "inevitable discovery" exception does not apply. The record shows that the discovery of the handgun in the car was causally linked to the unlawful seizure of the keys from Williams's friend, supporting the application of the exclusionary rule.

> 2.  <u>The unlawful seizure of the keys was the kind of deliberate conduct that can be deterred by exclusion of evidence, and the benefits of that deterrence outweigh the social costs of exclusion.</u>

The final requirement for the application of the Fourth Amendment exclusionary rule is that the unlawful conduct at issue must be "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. "The pertinent analysis of deterrence and culpability is objective," focusing on whether a well-trained officer would have known that the conduct at issue was unlawful "in light of 'all of the circumstances,'" rather than on the "subjective intent" of the officer at the time. *Id.* at 145–46 (quoting *United States v. Leon*, 468 U.S. 897, 923 n.23 (1984)). These requirements are satisfied in this case.

The record shows that seizure at issue here was "deliberate" in the sense that it reflected a conscious choice that was neither an accident nor a result of "isolated negligence." *See id.* at 137. Video and audio from the officers' body-worn cameras show that they had open discussion with one another and with superior officers about how to proceed before taking the keys. *See, e.g.,*

Gov't's Ex. B-2 at 19:12:12–19:12:46; Gov't's Ex. G at 19:15:15–19:15:16.  In the heat of an active investigation, the officers decided to seize the keys as evidence without a warrant or probable cause, and the Court has concluded that no valid exception to the rules requiring those prerequisites to seizure applied here.  However, it bears emphasis that nothing in the record indicates that the officers took these actions because they harbored any animosity toward Williams or that they were acting with the purpose of violating his rights.  The record shows instead that the officers thought they were doing the right thing under the circumstances, but that they were mistaken about how the law applied to the facts unfolding before them.  And the law at issue is not simple:  The Court has arrived at the conclusion that the seizure was unlawful only after careful analysis of competing theories, some of which may not have been readily apparent to the officers in the field.  In sum, the seizure of the keys was "sufficiently deliberate that exclusion can meaningfully deter it," *see Herring*, 555 U.S. at 144, but it was not deliberately wrongful.

The potential deterrent value of exclusion under these circumstances is strong.  "[T]he value of deterrence depends upon the strength of the incentive to commit the forbidden act." *Hudson v. Michigan*, 547 U.S. 586, 596 (2006).  In situations like the one the officers faced in this case, when there is a chance that evidence may be carried away from the scene before the officers realize its incriminating nature and secure it, officers face a strong incentive to seize that evidence immediately—as they did here—regardless of whether such a seizure is consistent with the Fourth Amendment.  Excluding the keys seized here serves the interests of the Fourth Amendment by deterring that unlawful conduct in future cases.

Finally, the social costs of exclusion, while substantial, do not weigh against exclusion.  This issue, too, is close.  As the D.C. Circuit has explained, the Fourth Amendment exclusionary rule has several familiar—and often substantial—social costs:  When it applies, it requires courts

to expend resources adjudicating "close claims" of constitutional violations; it risks impeding officers' ability to recover relevant evidence in the field; and "most importantly," it renders "relevant, incriminating evidence . . . unavailable at a defendant's trial." *Weaver*, 808 F.3d at 43. But while "[t]hose costs are real," they can be outweighed by sufficiently strong potential for deterrence of violations of important constitutional interests. *See id.* As the Supreme Court has explained, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329 (1987). Accordingly, "[b]ecause application of the exclusionary rule here would result in appreciable deterrence," the Court concludes in this case, as the D.C. Circuit has under similar circumstances, that "the benefits of applying the rule outweigh its acknowledged social costs." *See Weaver*, 808 F.3d at 43.

Because the seizure of the keys from Williams's friend was unlawful and causally linked to the discovery of other relevant evidence, and because the other requirements for the application of the exclusionary rule are satisfied, the Court shall suppress all evidence discovered as a result of that seizure, including the firearm and other evidence recovered from the silver Honda Accord.

## III. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** the [15] Motion to Suppress Tangible Evidence and **GRANT IN PART** and **DENY IN PART** the [58] Motion to Suppress Statements. An appropriate Order accompanies this Memorandum Opinion.


**Dated:** October 31, 2024                     /s/
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge